STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2023 KA 0362

STATE OF LOUISIANA

VERSUS

MANUEL MEEK, SR.

JUDGMENT RENDERED: **NOV 0 9 2023**

* * * * * * *

Appealed from the Seventeenth Judicial District Court
Parish of Lafourche • State of Louisiana
Docket Number 611032 • Division E

The Honorable F. Hugh Larose, Presiding Judge

* * * * * * *

Bertha M. Hillman                       COUNSEL FOR APPELLANT
*Louisiana Appellate Project*           DEFENDANT—Manuel Meek, Sr.
Covington, Louisiana


Kristine Russell                        COUNSEL FOR APPELLEE
*District Attorney*                     State of Louisiana
Joseph S. Soigent
Shaun George
*Assistant District Attorneys*
Thibodaux, Louisiana


* * * * * * *

**BEFORE: WELCH, HOLDRIDGE, AND WOLFE, JJ.**

**WELCH, J.**

The State of Louisiana charged the defendant, Manuel Meek, Sr., by bill of information with attempted second degree murder (count one), a violation of La. R.S. 14:27 and La. R.S. 14:30.1, and domestic abuse battery, third offense (count two), a violation of La. R.S. 14:35.3(E). The defendant pled not guilty and, after a trial by jury, the jury found the defendant guilty as charged on both counts. The trial court denied a motion for new trial and a motion for post-verdict judgment of acquittal filed by the defendant. The trial court imposed sentences of thirty-five years imprisonment at hard labor on count one, five years imprisonment at hard labor on count two, and ordered the first year on count two to be served without the benefit of probation, parole, or suspension of sentence.[1] The trial court further ordered that the sentences be served consecutively. The defendant now appeals, assigning error to the sufficiency of the evidence on count one, attempted second degree murder. For the following reasons, we affirm the convictions and sentences.

## STATEMENT OF FACTS

On November 8, 2021, Kammy Louque (the victim) was physically attacked by her ex-husband, the defendant, at the house where he was staying. Shortly before the incident, the defendant had been released from prison after serving a sentence for a domestic violence incident involving Louque and their daughter. The defendant blamed Louque for his incarceration and repeatedly stated that he was going to kill her. Shortly after Louque's arrival at the home, the defendant attacked her—punching her, twisting her arm, and grabbing her by the neck. Louque was able to

---

[1] The sentencing transcript reflects that the trial court failed to restrict benefits on count one, as statutorily mandated. See La. R.S. 14:27(D)(1)(a) and La. R.S. 14:30.1(B). However, when a trial court does not mention the restriction of benefits provided in the sentencing statute, such conditions are self-activating pursuant to La. R.S. 15:301.1(A). We further note that the minutes and commitment order do not include the statutorily-mandated restriction of benefits on the first year of the sentence on count two. However, the sentencing transcript reflects that the trial court set forth said restriction. Where there is a conflict between the transcript and the minutes, the transcript prevails. Thus, no corrective action is needed in this case. **State v. Lee**, 2023-0079 (La. App. 1st Cir. 6/2/23), 2023 WL 3861763, *1 n.1.

2

escape, after which she went to the hospital and gave a statement to the police. The next day, the police obtained a warrant for the defendant's arrest.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, the defendant argues that the evidence on count one, attempted second degree murder, was insufficient because he did not have the specific intent to kill Louque. The defendant contends that Louque pleaded with him to spare her life and that he responded by releasing her. He does not challenge his conviction on count two.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. 1, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See La. C.Cr.P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Welch**, 2019-0826 (La. App. 1st Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193.

The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **Welch**, 297 So.3d at 27. When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Coleman**, 2021-0870 (La. App. 1st Cir. 4/8/22), 342 So.3d 7, 12.

3

When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **Welch**, 297 So.3d at 27. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. James**, 2017-1253 (La. App. 1st Cir. 2/27/18), 243 So.3d 717, 721, writ denied, 2018-0419 (La. 1/8/19), 259 So.3d 1024.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982-83. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A).

Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. A specific intent to kill is an essential element of the crime of attempted murder. **Currie**, 321 So.3d at 982-83. Thus, although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree

4

murder requires specific intent to kill. **State v. Bishop**, 2001-2548 (La. 1/14/03), 835 So.2d 434, 437.

Herein, Louque testified that she went to the residence that day because the defendant sent her a text message telling her that if she came, afterwards they would go their separate ways and never speak again, and that things would be over between them. Louque stated, "[i]t was about us being done." As to the attack that occurred, Louque testified the defendant twisted her arm, punched her in the face, and strangled her to the point that she lost consciousness. Louque testified she was not sure of how long she was unconscious. Regarding the moments after she regained consciousness, Louque testified:

> Came back to. Still telling me he's got to kill me. I pleaded for my life. I was like please don't kill me. He's like . . . No, I have to kill you . . . you throw me away . . . Then he strangles me again. And I'm like trying to get some breaths of air. Struggling to get a breath of air. I can feel my urine coming out of me. Still steady begging for my life. He's like telling me, . . . if I let you go, you are going to go to the cops.

According to Louque, the defendant contemplated letting her leave, but told her if he did so, she would go to the police. While Louque promised she would not go to the police, the defendant threatened to shoot Louque, their daughter, and their grandchildren. Louque testified that the defendant used his phone to take photographs of her and threatened to have someone else kill her if he were to go to prison. Louque further stated that the defendant then forced her to have sex with him until he heard a knock on the front door.

Louque denied that the defendant used a weapon during the attack, but noted that he handed her a "curved cane knife" and dared her to use it to kill him. She stated she threw the knife across the room, explaining, "I'm not going to take the chance trying to do something to him and not succeeding and I'm dead for sure. So, no."

Louque testified that after they heard the knock on the door, the defendant jumped up, pulled his pants up, and stood in the doorway, "trying to figure out if he was going to answer the door[.]" Once the defendant decided to open the door, Louque hurriedly left. Louque did not respond to several subsequent attempts by the defendant to contact her by phone. Louque went home, took a bath, and then went to a friend's house and told him what happened. As advised by her friend, she then went to the police to report the incident and went to the hospital later that afternoon.

Louque was shown a copy of her hospital report wherein the examining physician noted that she denied any loss of consciousness, was alert during the evaluation, and was advised that her injuries were not life threatening. On cross-examination by the State, Louque confirmed her statement to a nurse, noted in the same medical record, that she could not breathe, thought she lost consciousness, and thought she was going to die during the attack.

Detective Pepper testified that when he arrived at the hospital, he first observed Louque in the emergency room. She was visibly shaken, crying, and withdrawn. After calming Louque down, he took a recorded statement from her. Detective Pepper observed injuries to Louque's left eye, noting what appeared to be blood in the corner of her eyelid, a hematoma and scratches on her neck, and a bruise on her cheek. He further noted that Louque complained of pain. Detective Pepper relayed Louque's account of the attack, which was consistent with her trial testimony. Along with taking the statement, Detective Pepper also took photographs of Louque's face and neck, showing her visible injuries. Detective Pepper testified that Louque's injuries were consistent with her account of the attack.[2] After a search warrant was obtained and executed, the defendant's cell phone was located in his bedroom. The phone contained photographs of Louque in which her injuries were

---

[2] Louque also relayed to Detective Pepper and testified at trial regarding the facts of past instances, two of which form the basis for the predicate offenses on count two, that are not at issue in this appeal.

visible. After his arrest, the defendant was advised of his **Miranda**[3] rights and participated in a recorded interview after executing a waiver of rights form.

At the outset of the interview, the defendant inquired as to why he was only being charged with domestic abuse battery, stating that the charge should have been attempted murder. The defendant stated that he planned on killing Louque because there was no basis for his prior conviction and jail sentence, for which he blamed Louque. He further stated that if he was freed after the interview, he was going to kill Louque. The defendant denied raping or strangling Louque, but said that he "f*****" her, and punched her in the eye and in the ribs. He admitted that he knocked her out and that she was unconscious for about twenty seconds with her eyes rolling in the back of her head. He stated that he thought he had killed her, which was "[his] intentions." When asked what happened after Louque regained consciousness, the defendant stated she begged him not to kill her, and he told her, "I oughta kill you . . . that's my intentions of killing you . . . you lied . . . and sent me to prison." He further admitted that he told Louque that he would kill her if she called the police, would have someone else kill her if he had to go to jail, and admitted to taking the pictures. He stated that the threat to have someone kill her was just a "scare tactic." He confirmed that blood was on the bed, noting that he left it there for the police.

During a recorded jail phone call with his mother, the defendant stated that he did not choke Louque, but said he punched her and knocked her out. The defendant further stated that he picked her up and grabbed her by her throat after knocking her out. During a second jail call, the defendant again denied raping

---

[3] Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. **Miranda v. Arizona**, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

Louque, and again said that he "f*****" her, punched her in the eye and ribs, and threw her on the bed.

During his trial testimony, the defendant admitted to complaining to Louque about her lying and putting him in jail. He stated that he was mad at that point, so he "popped her like real quick" in the eye. He further testified that he jerked her by the arm and hit her once in the ribs. However, the defendant again denied knocking Louque out. He once again admitted to threatening Louque that he would have someone kill her if she tried to do anything (go to the police) and confirmed that he gave Louque a machete. The defendant further testified that he and Louque had sex and were using methamphetamine[4] together when there was a knock on the door, at which point Louque left. He testified that he never had the intention of killing Louque, confirming that he could have killed her if he wanted to do so.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Further, if believed, the testimony of the victim alone, with no other evidence, is sufficient to prove the elements of the offense. When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **State v. Alexander**, 2014-1619 (La. App. 1ˢᵗ Cir. 9/18/15), 182 So.3d 126, 131, writ denied, 2015-1912 (La. 1/25/16), 185 So.3d 748. It is well settled that the trier of fact can accept or reject, in whole or in part, the testimony of any witness. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **State v. Lavy**, 2013-1025 (La. App. 1ˢᵗ Cir. 3/11/14), 142 So.3d 1000, 1006, writ denied, 2014-0644 (La. 10/31/14), 152 So.3d 150.

---

[4] We note that Louque specifically denied using the drugs offered to her by the defendant that day.

The defendant now argues that his lack of specific intent to kill was evidenced by the fact that he could have killed Louque, but chose not to do so. However, the verdict in this case indicates that the jury rejected the defendant's theory. We note that voluntarily withdrawing from an offense at a point in time after culpability for an attempt had already attached is not a defense to attempted murder. **Ordodi**, 946 So.2d at 663. Moreover, Louque testified that despite her promise to not tell the police, she was not released, but was instead further threatened and violated. According to Louque, it was the defendant's decision to answer the door that provided her with an opportunity to escape, not the defendant's acquiescence. Further, the defendant's own incriminating statements detailing his attack on Louque were, in part, consistently repeated before and during trial. Based on Louque's account of being lured to the residence, verbally threatened, and brutally attacked, the photographs of Louque's injuries, and the defendant's statements, the jury could have rationally inferred the defendant's specific intent to kill Louque and commission of overt acts in furtherance of that goal. In reviewing the evidence presented at trial, we cannot say that the jury's determination was irrational under the facts and circumstances presented. See **Ordodi**, 946 So.2d at 662.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of attempted second degree murder. Thus, we find no merit in the defendant's sole assignment of error.

**COVICTIONS AND SENTENCES AFFIRMED.**